UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IN RE PUBLICATION PAPER ANTITRUST LITIGATION | : : : | Docket No.  3:04 MD 1631 (SRU) |
| THIS DOCUMENT RELATES TO: | : : : : | ALL ACTIONS |

**RULING ON MOTIONS TO DISMISS**

The plaintiffs, representing a putative class of purchasers of high quality paper, allege that the defendants, who sell that paper, conspired to fix prices in violation of federal antitrust laws.[1] All the defendants move to dismiss the complaint for failure to state a claim and as barred by the statute of limitations.[2] Additionally, two foreign defendants argue that this court has no personal jurisdiction over them.

I conclude that the complaint does state a cause of action, but that it fails to state a claim regarding actions taken outside the limitations period. Accordingly, the claims concerning actions taken more than four years before the filing of the complaint are dismissed without prejudice. Additionally, I conclude it prudent to defer ruling on the personal jurisdiction issue until the close of discovery.

---

[1] This consolidated action also includes two individual plaintiffs, Three Z Printing Company and Nies Artcraft Companies, Inc., both of whom agreed at oral argument that this ruling would be binding on the claims in their complaint.

[2] The defendants also moved to strike various portions of the complaint as unduly prejudicial. As defendants acknowledged at oral argument, because the jury will not see the complaint, there is currently no prejudice to the defendants. That motion is consequently denied.

**I.     Background**

The following facts, alleged in the First Amended Complaint, are assumed true for present purposes.

"Supercalendared Paper" is paper that has been specially manufactured to obtain an extremely smooth surface and high gloss. "Coated Paper" is paper that has been treated with various chemicals in order to invest the paper with desirable qualities such as brightness. Both types of paper are, in this litigation, referred to as "Publication Paper."

The plaintiffs, all located in the United States, purchased Publication Paper from 1993 to the present. The defendants, spread around the world, were the primary sellers of Publication Paper during that time period.

Beginning in 1993, "the Defendants and their co-conspirators commenced their collusive behavior by agreeing to limit supply and to increase prices in lockstep, and in fact doing so." (Complaint ¶ 83) Specifically, the defendants participated in "covert meetings and conversations . . . in which the prices, volume of production and sales, and markets for Publication Paper were discussed and agreed upon." (Complaint ¶ 98) These meetings primarily took place at private dinners, before official conferences, and at the meetings of a Finnpap, a Finnish marketing association. (Complaint ¶¶ 98, 102)

The conspiracy resulted in three types of behavior. First, the defendants raised prices. For example, in 1995, the defendants raised all Publication Paper prices by approximately 30% (Complaint ¶ 84), and in late 2004, the defendants raised the price of Coated Paper by sixty dollars per ton. (Complaint ¶ 85) Those price increases could not be ascribed to market forces, but only to collusion. (Complaint ¶¶ 81, 84-85)

Second, the defendants reduced their capacity to produce Publication Paper in the United States in order to allow them to raise prices. As a result, from 2001 to 2004, the defendants reduced production capacity in a number of plants. (Complaint ¶¶ 90-92)

Third, the defendants engaged in a "highly unusual" joint distribution scheme. (Complaint ¶ 97) In 1998, one of the defendants, International Paper, used its distributing arm, named "xpdex," to distribute not only its own paper but that of its competitors, allowing the defendants to ensure fixed and consistent prices. (Complaint ¶¶ 96-97) In addition, the defendants agreed to divide up the United States market and agreed that certain United States companies would stay out of the European paper markets. (Complaint ¶¶ 100-01)

Up until May 2004, when various government bodies made public their investigation of the Publication Paper industry, the plaintiffs knew nothing of the defendants' conspiracy and were unaware that the price of Publication Paper was artificially high. (Complaint ¶¶ 104-05) That ignorance was partly the result of the fact that the conspirators' meetings were secret and partly the result of the defendants' dissemination of false reasons for price increases. (Complaint ¶ 107-08)

## II.   Failure to State a Claim

The defendants argue that the complaint is fatally deficient because it consists of nothing more than allegations of lawful parallel price increases coupled with conclusory allegations that those increases were the result of a conspiracy. I do not agree with that characterization of the complaint.

Admittedly, the complaint contains numerous allegations that, standing alone, might be insufficient to state a claim of antitrust violation. The mere fact that prices in an industry

increase, or production capacity declines, does not necessarily give rise to a cause of action, but the plaintiffs in this case have alleged more.  The plaintiffs here have alleged that prices increased and production declined as the result of agreements reached by the defendants in numerous secret meetings.  There is no question that such allegations – allegations that the defendants met, agreed to fix prices at a certain level, and then did fix prices at that level – state a viable antitrust claim.

The defendants also argue that the factual allegations of the complaint, even if they do state a viable claim, should be stricken because they are inconsistent with prior versions of the complaint and with external data – not attached to or incorporated by the complaint – concerning pricing in the paper industry.  That argument is without merit.  Inconsistency between versions of a complaint is entirely permissible, as is inconsistency within the complaint itself.  Fed. R. Civ. P. 8(e)(2).  To the extent the complaint is inconsistent with external evidence, the defendants will be entitled to make that argument in a motion for summary judgment.  At the motion to dismiss stage, I consider only the well-pled allegations of the complaint.

### III.     Statute of Limitations

The defendants argue that, to the extent the plaintiffs' claims involve actions that took place before June of 2000, the claims are barred by the four-year antitrust statute of limitations.  The plaintiffs do not dispute that any alleged antitrust activity that occurred prior to June 2000 is outside of the limitations period, but they argue that the statute of limitations should be tolled due to fraudulent concealment.

A.     Legal Standard

"[A]n antitrust plaintiff may prove fraudulent concealment sufficient to toll the running of the statute of limitations if he establishes (1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." *State of New York v. Hendrickson Bros. Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988).

Rule 9(b) of the Federal Rules of Civil Procedure requires that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." A claim that the statute of limitations should be tolled because of fraud is, obviously, a claim of fraud, and therefore the circumstances constituting that fraud must meet Rule 9(b)'s requirements. *See Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983); *Butala v. Agashiwala*, 916 F. Supp. 314, 319 (S.D.N.Y. 1996).

The defendants argue that the plaintiffs have not adequately pled concealment or proper diligence, i.e., the first and third elements of the test for fraudulent concealment.[3] I agree.

B.     Concealment

A plaintiff can prove the concealment element in one of two ways: (a) by demonstrating that the defendant took affirmative steps to prevent discovery of the claim or injury, or (b) by demonstrating that the violation itself was "self-concealing," that is, by showing that it is the type

---

[3] The plaintiffs have adequately pled ignorance, the second element of the test. The complaint alleges that the plaintiffs were unaware of the defendants' unlawful conduct until 2004. (Complaint ¶ 105) Under Rule 9(b) such general averments of knowledge are sufficient. Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other condition of mind of a person may be averred generally.").

of violation that by its very nature is designed to appear innocent. *Hendrickson*, 840 F.2d at 1083-84. The plaintiffs assert they have sufficiently alleged both types of concealment.

### 1. *Affirmative Acts*

The plaintiffs allege that the defendants' conspiracy was concealed "by various means and methods, including, but not limited to, secret meetings, misrepresentations to customers concerning the reason for price increases and surreptitious communications between the Defendants by use of the telephone or in-person meetings at trade association meetings (and elsewhere) in order to prevent the existence of written records." (Complaint ¶ 108)

These allegations, which are allegations of fraud by the defendants, are wholly insufficient under Rule 9(b). There is no indication which defendant or defendants made misrepresentations to customers, to which customers the misrepresentations were made, when they were made, or what was said. Similarly, there is no indication of how secret meetings were used to prevent discovery of the injury or claim,[4] who was involved in those meetings, or when they took place.

### 2. *Self-concealing*

The plaintiffs contend that, even ignoring any affirmative acts by the defendants, the conspiracy here was "self-concealing," which is sufficient to establish the first element of

---

[4] I disagree with the argument made by the defendants that the plaintiffs must necessarily allege with particularity the details of secret meetings in order to establish fraudulent concealment. The meetings may constitute the conspiracy itself and not the actions taken to conceal the conspiracy. For example, if two people conspire to make a fraudulent statement, it is the fraudulent statement that must be pled with specificity, not the agreement to make the statement. Nevertheless, in this case, the plaintiffs have explicitly claimed that the secrecy of the meetings was part of the effort to fraudulently conceal the violations, and, consequently, they are required to meet Rule 9(b)'s pleading requirements.

fraudulent concealment.

A self-concealing violation is one where a fact finder could infer solely from the nature of the violation that it was concealed from the defendant. A self-concealing violation is one where fraudulent concealment is a necessary component of the violation itself, i.e., without the concealment, the violation could not have taken place. For example, a plaintiff who proves he was sold a fake antique at an antique store has necessarily proved that the antique was passed-off as genuine; if the antique had not been passed-off as genuine, there would have been no violation in the first place. *Hendrickson*, 840 F.2d at 1083-84. Similarly, a plaintiff who establishes collusive bid-rigging has necessarily established that the true nature of the bids was concealed because, were they not, there is no way they would have been accepted at the auction. *Id.*

A price-fixing conspiracy may be self-concealing, depending on the circumstances. In a competitive, well-regulated industry it will often be the case that a price-fixing conspiracy, if not concealed, would immediately fail because of governmental or private legal action. In such circumstances, any announcement of a price increase will carry with it an implicit statement that the price increase is legitimate, i.e., the result of competitive forces, not collusion. Nevertheless, not every price-fixing conspiracy is self-concealing. For example, there may be industries in which the participants are aware of collusion but it is not stopped because of indifference, fear, or because the perpetrators are exempt from, or beyond the reach of, antitrust laws. In such circumstances, the defendants' announcement of a price increase will not carry with it any implied certification of legitimacy, and so, absent additional circumstances, will not be self-concealing.

Consequently, whether a particular price-fixing conspiracy – or, more precisely, whether

a particular announcement of a price increase – necessarily conceals its true nature depends on the nature of the industry and the circumstances surrounding the announcement. Moreover, when the claim is that a pre-arranged price announcement is "self-concealing," i.e., that it carries with it a pretense of legitimacy, the claim is essentially one of "fraud by omission" and so must be pled with the particularity required by Rule 9(b). Accordingly, merely alleging a price-fixing conspiracy, and nothing more, does not establish the existence of a "self-concealing" violation.[5] A plaintiff must allege why the circumstances surrounding the announcement of the price increases in question were such that it would necessarily be assumed that they were the result of legitimate market forces. In other words, the plaintiff must allege circumstances that make clear why the announcements of price increases would have conveyed fraudulent information. These allegations need not be lengthy. It would, for example, likely be sufficient for a plaintiff to allege that the industry in question is such that price increases are not abnormal, that such increases are typically ascribed to normal market forces, that an openly collusive price increase would not be tolerated, and that there was nothing suspicious about the circumstances under which each of the pre-limitations period price announcements were made.

  Here, however, the plaintiffs have failed to meet their pleading burden. They have alleged nothing more than the conclusion that the conspiracy here was "inherently self-concealing." (Complaint ¶ 107) They only allege one example of a price increase before the start of the limitations period (Complaint ¶ 84), and do not allege any circumstances surrounding the announcement of that increase permitting an inference of concealment. In other words, there

---

[5] Carried to its logical conclusion, the alternative would mean that the antitrust statute of limitations never applies to a price-fixing conspiracy.

is nothing in the complaint that indicates why the plaintiffs, on hearing the price increase announcements, would have been misled. Indeed, the circumstances that are alleged concerning the defendants' price increases point to the opposite conclusion. The plaintiffs allege that the price increases were *not* explainable by ordinary market forces, an allegation that potentially indicates that the announcements did not bear the hallmarks of legitimate increases and so were not misleading.

When plaintiffs – like the plaintiffs here – have been subject to more than ten years of price increases before bringing suit and claim that their delay is excused because each of those increases was a fraud, Rule 9(b) requires that they allege with particularity the circumstances surrounding those increases. Unless that is done here, there is no basis for tolling the statute of limitations. *See, e.g., Butala*, 916 F. Supp. at 320 (dismissing complaint after concluding "plaintiffs merely state in a conclusory fashion that the defendants' fraud was self-concealing without alleging how any of the aspects of the defendants' misrepresentations obscured their fraud").

    C.    <u>Diligence</u>

Even if a plaintiff establishes that a defendant concealed a violation and that the plaintiff did not learn of that violation until after the limitations period, the plaintiff must also establish that the failure to discover the concealment earlier was not the result of any lack of diligence. In other words, a plaintiff must establish that reasonable diligence would not have uncovered the fraud.

Typically, a plaintiff will prove reasonable diligence either by showing that: (a) the circumstances were such that a reasonable person would not have thought to investigate, or (b)

the plaintiff's attempted investigation was thwarted.  In either case, the claim is one of fraud – either the defendant's initial fraud was so complete that it precluded suspicion or any suspicion was allayed by further fraud – and so, at the pleading stage, when pleading diligence the plaintiff must satisfy the requirements of Rule 9(b).  *See, e.g.*, *In re Merrill Lynch Ltd.*, 154 F.3d 56, 60 (2d Cir. 1998) (dismissing complaint containing "no allegation of any specific inquiries of Merrill Lynch, let alone detail when such inquiries were made, to whom, regarding what, and with what response"); *In re Nine West Shoes Antitrust Litigation*, 80 F. Supp. 2d 181, 193 (S.D.N.Y. 2000) ("Plaintiffs must plead due diligence with specificity.").

Here, the plaintiffs have alleged that starting in 1998, two years before the start of the limitations period, the defendants used a "highly unusual" joint marketing entity to sell their paper at fixed prices.  (Complaint ¶ 97)  The plaintiffs have offered no allegations indicating they took any steps to investigate that entity, let alone any allegations concerning ways in which their investigation was thwarted by the defendants.

Additionally, the plaintiffs have alleged that the defendants engaged in "dramatic, lockstep price increases despite stable or declining demand and input costs . . .," all while making "contemporaneous statements that were intended to signal price increases to rivals."  (Complaint ¶ 81)  The plaintiffs have not offered any allegations of steps taken to investigate those circumstances or any indication that they were not aware of those circumstances (and consequently could not have been expected to investigate them).[6]

---

[6] I do not agree with the defendants that the plaintiffs' allegations that the various actions taken by the defendants were not the result of market forces necessarily indicates that the plaintiffs were on notice of their claims.  All antitrust violations are attempts to create conditions that would not arise if only the forces of fair competition were at work.  Thus, markets affected by antitrust violations necessarily have different characteristics than competitive markets.

Accordingly, because the plaintiffs have not alleged anything regarding inquiries made into the activities alleged in the complaint or why such inquiries were not made, they have not satisfied their burden of pleading reasonable diligence.[7] *Masters v. Wilhelmina Model Agency*, 2003 WL 1990262, *2 (S.D.N.Y. Apr. 29, 2003) ("plaintiffs make no allegations of the inquiries, if any, they made, when such inquiries were made, to whom those inquiries were directed, what those inquiries were in regard to, and what response was obtained"); *Philip Morris Inc. v. Heinrich*, 1996 WL 363156, *12 (S.D.N.Y. June 28, 1996) ("more specific information is required as to the difficulties, if any, it encountered with the progression of the investigation").

### D. Dismissal of the Complaint

I conclude that the plaintiffs have not sufficiently alleged the circumstances that resulted in the fraudulent concealment of defendants' actions from 1993 to 2000. Moreover, even if the plaintiffs had sufficiently alleged that the defendants' actions were fraudulently concealed from actual discovery, they have not sufficiently alleged why those actions could not have been discovered by reasonable diligence. Accordingly, all claims regarding violations that predate June 2000 are dismissed. Nevertheless, because those claims fail only on the ground they are not pled with the requisite specificity, and not because they are substantively untenable, there is no

---

Consequently, if every plaintiff was assumed to have perfect knowledge of market forces, then no antitrust conspiracy would ever be concealed and there would be no law of "fraudulent concealment" in that context. Put another way, it may be that the plaintiffs – though they have not alleged it – only realized in retrospect that market forces did not dictate the defendants' price increases.

[7] I acknowledge that the ultimate question whether the plaintiffs' investigation or lack thereof was reasonable is one of fact and not resolvable on a motion to dismiss. *See, e.g.*, *In re IPO Antitrust Litigation*, 2004 WL 48722 (S.D.N.Y. Mar. 12, 2004); *In re Sumitomo Copper Litigation*, 120 F. Supp. 2d 328, 346-47 (S.D.N.Y. 2000). That does not, however, excuse plaintiffs from pleading the circumstances surrounding their diligence or lack thereof.

reason why the plaintiffs should not be entitled to replead the complaint. The dismissal is, therefore, without prejudice to repleading within thirty days from the date this ruling issues.

## IV.    Personal Jurisdiction

Two of the defendants in this case, Norske Skogindustrier ASA ("Norske"), a Norwegian company, and Sapi Limited ("Sapi"), a South African company, move to dismiss the complaint under Rule 12(b)(2) on the ground that this court lacks personal jurisdiction over them.

If, prior to the plaintiffs taking discovery, a defendant moves to dismiss a complaint for lack of personal jurisdiction under Rule 12(b)(2), the plaintiff is only required to make out a *prima facie* case of jurisdiction, which can be done on affidavits and other evidentiary submissions, or solely on the basis of the good faith allegations in the complaint, which are accepted as true for purposes of the motion. *PDK Labs Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997). A court, however, has considerable flexibility in deciding whether it would like to review the motions on a more expanded record by requiring more submissions, allowing jurisdictional discovery, or holding a hearing. *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 364 (2d Cir. 1986); *Marine Midland Bank v. Miller*, 664 F.2d 899 (2d Cir. 1981). Moreover, a court can, if appropriate, defer ruling on a motion until trial. Fed. R. Civ. P. 12(d).

In this case, the record before the court consists of a sparse complaint and minimal submissions by the parties. The personal jurisdiction issue, however, appears to involve a number of significant factual questions, which would be better resolved on a fuller record.

First, I must determine whether there is an appropriate statutory basis for jurisdiction. Because this is multi-district litigation, the answer to that question may depend on the contacts

that the two defendants have with all of the states in which the transferor courts are located.[8] *See*

*In re MTBE Products Liability Litigation*, 2005 WL 106936, *6 (S.D.N.Y. Jan. 18, 2005).

Currently the record on state contacts consists only of the general allegations that the plaintiffs –

who reside in the forum states – have been injured by the defendants' conspiracy.  At this stage,

before discovery has been taken, those allegations may be sufficient, but I am reluctant to make a

finding on the jurisdictional issue with so little support.  There is no indication of what harm is

directly attributable to the two foreign defendants in question or of exactly what role those

defendants are alleged to have played in the conspiracy.

     Second, assuming there is a statutory basis for jurisdiction, I will need to determine

whether an exercise of jurisdiction comports with due process.  As it stands, the complaint

contains allegations that all the defendants participated in a conspiracy intended to fix prices in

the United States.  At this stage, i.e., before discovery has been completed, that allegation

appears to technically satisfy the "effects test" for personal jurisdiction.  *See In re Magnetic*

*Audiotape Antitrust Litigation*, 334 F.3d at 208 (executive's presence at a price-fixing meeting, if

---

[8] The plaintiffs argue that they need not meet the statutory jurisdictional requirements of any state because the Clayton Act, Section 12, 15 U.S.C. § 22, provides for service of process on foreign defendants wherever they are located.  Whether that reading of Section 12 is correct or whether Section 12's jurisdictional clause is limited by its venue requirement – namely, that suit can only be brought "in any district wherein [the defendant] may be found or transacts business" – is a question on which the circuits are divided.  *Compare GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1350 (D.C. Cir. 2000) (holding section 12's venue clause must be satisfied before its service of process clause confers jurisdiction), *with Go-Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1408-13 (9th Cir. 1989) (holding section 12's service of process clause confers jurisdiction independent of its venue clause).  The Second Circuit has not decided the issue.  *In re Magnetic Audiotape*, 334 F.3d F.3d 204, 207 (2d Cir. 2003) (assuming, but not deciding, that section 12 confers jurisdiction independent of its venue provision).  Even if the plaintiffs are correct that the Second Circuit would agree with them, prudential considerations counsel against deciding that unsettled point of until after development of a better record on the due process issues.

established, "arguably would satisfy the 'effects' test"). Nevertheless, the Second Circuit has cautioned that the effects test should "be applied with caution, particularly in the international context." *Leasco Data Processing Equipment v. Maxwell*, 468 F.2d 1326, 1341 (2d Cir. 1972). That caution appears particularly warranted here where the plaintiffs seek to gain expansive jurisdiction over foreign defendants on the basis of a few extremely vague allegations. There is not, for example, any specific indication what part the foreign defendants played in the conspiracy; what their intentions were; or what effect their role in the conspiracy had on the United States.

The general, but presumably good faith, allegations of the complaint arguably establish a *prima facie* case of jurisdiction. Nevertheless, I think it unwise, on the basis of such a thin record, to determine conclusively that I may exercise jurisdiction over two defendants who, save for the allegations made in the complaint, appear to have no direct connection with the United States. Furthermore, it appears that much, if not all, of the evidence relevant to the question of personal jurisdiction will be the same as evidence relevant to the ultimate issues in this case, e.g., evidence concerning the part the foreign defendants played in the conspiracy, their intentions, and the effect of the conspiracy on the forum states and the United States as a whole. Accordingly, rather than granting jurisdictional discovery or holding a hearing, I conclude the most appropriate and efficient resolution of the issue is to defer a ruling until the close of merits discovery. I will therefore deny the current motion without prejudice to its renewal at the conclusion of discovery.

## V.	Conclusion

The defendants' Motion to Dismiss and Motions to Strike Portions of Plaintiffs' Consolidated Amended Complaint (doc. # 108; doc. # 113) are DENIED.

The defendants' Motion to Dismiss Claims Outside the Statute of Limitations (doc. # 110) is GRANTED.  The plaintiffs may file an amended complaint within thirty days.

Norske and Sappi's Motions to Dismiss for Lack of Jurisdiction (doc. #  112; doc. # 117) are DENIED without prejudice to their renewal at the close of discovery.

It is so ordered.

Dated at Bridgeport, Connecticut, this 6th day of September 2005.

      /s/ Stefan R. Underhill
           Stefan R. Underhill
           United States District Judge