| | |
|---|---|
| IN RE PUBLICATION PAPER ANTITRUST LITIGATION | CIVIL ACTION NO. 3:04md1631 (SRU) |
| THIS DOCUMENT RELATES TO: | |
| PARLIAMENT PAPER, INC., AUSTIN PRINTING CO., INC., and DIGITAL COLOR IMAGING, INC., on behalf of Themselves and all others similarly situated, | |
| Plaintiffs, | |
| v. | |
| STORA ENSO OYJ and STORA ENSO NORTH AMERICA CORP., | |
| Defendants. | |

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In the fifth amended consolidated class action complaint (doc. # 386), the plaintiffs,

representing direct purchasers of commercial grade paper, allege that defendants Stora Enso

North American ("SENA") and Stora Enso Oyj ("SEO") conspired with non-party, UPM-

Kymmene Corp. ("UPM"), to fix the price of certain grades of commercial paper in violation of

section one of the Sherman Act. Specifically, the conspiracy alleges that long-time friends

Markku Tynkkynen of UPM and Kai Korhonen of SENA[1] came to an understanding that SENA

and UPM would follow price increases announced by other industry participants. Plaintiffs also

---

[1] From August 2000 until May 2003, Kai Korhonen was the President of SENA; Markku Tynkkynen was the President of the Magazine Paper Division of UPM. Tynkkynen held that position from January 2002 until January 2004.

allege that Tynkkynen and Korhonen, in furtherance of the price-fixing scheme, coordinated mill closures to reduce the available supply of commercial grade paper. Defendants move for summary judgment (doc. # 511) on all claims brought by the direct purchaser class plaintiffs. For the reasons that follow, defendants' motion for summary judgment is granted in its entirety.[2]

## I.     Standard of Review

### A.     General Summary Judgment Standard

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2010); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but must present significant probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

---

[2] Defendants moved to strike portions of plaintiffs' Local Rule 56(a)(2) statement and to deem admitted certain facts. (Docs. ## 560 & 561). In light of this ruling, the motions are denied as moot.

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247-48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

B.     Antitrust Summary Judgment Standard

Although the movant bears the initial burden of demonstrating "the absence of a genuine issue as to any material fact," s*ee Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970), in response, the party asserting that a fact is "genuinely disputed must support the assertion by" citing to particular parts of the record or showing that the materials cited do not establish the absence of a genuine dispute.  Fed. R. Civ. P. 56(c) (2010).  "While the non-moving party must show more than a 'metaphysical doubt' as to material facts," *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir.), *cert. denied*, 484 U.S. 977 (1987) (citing *Matsushita Electric Industrial Co.,* 475 U.S. at 586), all inferences must be drawn in favor of the non-moving party.  *Id*. at 252.  The Supreme Court, however, has stated that "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case."  *Matsushita*, 475 U.S. at 588.

Specifically, "conduct as consistent with permissible conduct as with [an] illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy."  *Id.*; *see also Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984).  The non-moving party must set forth evidence that "tends to exclude the possibility that the [defendants] were acting independently." *Monsanto,* 465 U.S. at 764.  Summary judgment is particularly favored in antitrust cases because of the "concern that protracted litigation will chill pro-competitive market forces."  *PepsiCo, Inc. v. Coca-Cola Co.,* 315 F.3d 101, 104 (2d Cir. 2002) (citing *Tops Mkts., Inc. v. Quality Mkts., Inc.,* 142 F.3d 90, 95 (2d Cir. 1998)).  Accordingly, although reasonable inferences will be drawn in favor of the non-moving party, those inferences "must be reasonable in light of competing inferences of acceptable conduct."  *Id.*

## II.    Plaintiffs' Case at Summary Judgment[3]

Commercial grade paper is a commodity product used for printing and writing. These papers come in several different grades typically categorized by the type of pulp used in the paper, the paper's brightness and the presence or absence of coating on the paper. Commercial papers range from fine to supercalendered. Fine papers, also known as grades 1, 2, or 3, are coated and generally used for high-end publications. Magazine papers, grades 4 or 5, are used for printing catalogues and magazines. The least expensive paper, supercalendered, is most often used in advertising inserts found in newspapers. Although the parties generally dispute the definition of "publication paper" they agree, for the purposes of this motion, that the grades of commercial paper at issue here are grades 3, 4, and 5 of coated paper (hereinafter "publication paper").

During the years 2002-2003, the primary manufacturers and sellers of publication paper in the United States were International Paper ("IP"), SENA, UPM-Kymmene, Inc., a wholly-owned subsidiary of UPM, MeadWestvaco ("Mead"), Bowater, Norske Skög North American ("Norske"), and Madison. IP, SENA and UPM were the largest manufacturers and sellers of publication paper, with each holding roughly 17 to 21 percent of the market. At the start of 2002, the available supply of publication paper was elevated and selling for historically low prices. Despite this oversupply and decreased demand, there were three industry-wide price increases announced in August 2002, November 2002, and February 2003. During the same time period, UPM and SENA limited the production of publication paper at certain facilities.

Tynkkynen and Korhonen have a long-standing relationship. The two met over 30 years ago when they were both employed at the Varkus Mill in Finland. A predecessor company to

---

[3] All facts set forth in the ruling are drawn from the parties' Local Rule 56(a)1 and 56(a)2 Statements filed in connection with the motion for summary judgment and the opposition. Unless otherwise noted, the facts are not in dispute.

SEO owned the Varkus Mill. From August 2000 until May 2003, Korhonen was the President of SENA, a subsidiary of SEO.[4] In 2000, SENA acquired Consolidated Papers. Korhonen was charged with coordinating the integration of the two entities.

In light of its acquisition of Consolidated Papers, SENA's operations suffered. SENA attributed this to poor market conditions and its aging assets. In January 2002, SENA internally implemented a "Profit Enhancement Plan" ("PEP") to correct its difficulties. SENA characterized the PEP as designed to "restructure, rebuild, or shut down some of SENA's inefficient assets to improve its competitiveness" in the publication paper market. SENA invested $250 million in the PEP and it went into effect in January 2002, although SENA did not publicly announce implementation of the PEP until August 27, 2002. The PEP consisted of:

- Restructuring SENA's manufacturing assets;
- Investing in machine rebuilds at SENA's mills in Wisconsin Rapids, Kimberly, and Biron;
- Machine modifications at SENA's mills in Niagara and Whiting;
- Permanently shutting down or placing on standby certain older machines; and
- Work force reduction in SENA's offices and mills in Wisconsin Rapids, Biron, Kimberly, and Port Hawkesbury.

SENA stated that these steps would remove older assets and replace them newer, more efficient assets. As a result, some production capacity would diminish for certain grades but increase for others. For example, SENA ceased utilizing paper machine # 24 at the Biron plant but replaced it with increased capacity from machine # 26. Similarly, a newer machine at the Port Hawkesbury plant replaced a machine taken out of operation at the Kimberly plant. Korhonen was responsible for implementing the PEP. The August 27, 2002 public press release

---

[4] Korhonen left SENA in May 2003 to assume the role as Senior Executive Vice President of SEO. Doc. # 512 at 28. At SEO, Korhonen was responsible for the paper product area; he no longer maintained any involvement in the operation of SENA. *Id.* at ¶29. Lars Bengtsson succeeded Korhonen as the President of SENA. *Id.* at ¶32. Korhonen retired from SEO in August 2007; in December 2007, NewPage Corp. acquired SENA. *Id.* at ¶17, 33.

announcing the PEP touted a final capacity reduction of 160,000 tons. In his capacity as President, Korhonen also had authority to approve or veto the price charged for publication paper in the United States.

Plaintiffs' claims against SENA hinge on the assertion that it acted in concert with UPM. During the class period Tynkkynen was the President of the Magazine Paper Division of UPM. Tynkkynen held the position from January 2002 until January 2004.[5] In February 2002 Heikki Malinen was hired as UPM's President of North American Sales. He reported to Kevin Lyden, President of UPM-Kymmene, Inc. In April 2002, Malinen developed a strategy for UPM North America called "Go to Market Strategy" ("GMS"). The GMS directed UPM to adopt the role of a market "follower" and not a leader.

In August 2002, Tynkkynen invited Korhonen to lunch. On August 8, 2002 the pair met for lunch at UPM's Helsinki, Finland offices. When Korhonen arrived at UPM's offices, he signed into the visitor log. The lunch lasted for approximately one hour and thirty minutes and no one else attended the lunch meeting. Tynkkynen, in preparation for the lunch meeting, attempted to calculate SENA's market position on coated grade 5 paper and supercalendered paper. He wanted to clarify SENA's position in the United States market to ascertain whether SENA could be a price leader. Korhonen testified that he told Tynkkynen that SENA did not calculate its capacity in the same way Tynkkynen calculated capacity and Korhonen also rejected the notion that SENA was a market leader. During the meeting Korhonen characterized the U.S. magazine paper market as fragmented and competitive and noted the strictness of U.S. anti-trust laws.

---

[5] In January 2004, Tynkkynen became the Executive Vice President of Resources and Business Support Functions of UPM.

Based on the lunch meeting, Tynkkynen concluded that SENA would follow price increases announced by any major North American producer. It is this exchange, and Tynkkynen's independent belief about SENA's activities, that forms the basis of plaintiffs' contention that both men left the meeting with an understanding that SENA and UPM sought capacity reductions and intended to match future publication paper price increases, if any, announced by rival producers.

Korhonen did not disclose the fact of the meeting or the substance of it to anyone at SENA. Similarly, Tynkkynen did not share the fact of the meeting with others at UPM. The next day, on August 9, 2002, IP, Mead and Sappi announced that they were increasing prices for publication paper grades 2, 3, and 4, effective October 1, 2002. Mead and IP's increase would be $2.00 per hundredweight (cwt). Sappi's increase was $3.00 per cwt for web products and $4.00 per cwt for sheet products; however, on August 13, 2002 Sappi amended its increase to match IP's increases across the board. On August 13, 2002, SENA also announced a $2.00 increase effective October 1, 2002 for grades 2, 3, and 4. UPM followed on August 21, 2002 with a $2.00 cwt increase on only grades 3 and 4.

On August 27, 2002 SENA publically announced its PEP. The next day Tynkkynen called and congratulated Korhonen on the program. Korhonen did not disclose to others at SENA the fact that the August 28, 2002 phone call had taken place. Doc. # 512 at ¶151.

On October 30, 2002, Tynkkynen met with SEO's Berndt Rettig for one hour at a hotel in Frankfurt. Doc. # 530 at ¶334. Rettig, the Executive Vice President of SEO and member of its management group, met with Tynkkynen to discuss the status of European publication paper market. *Id.* at ¶336. Plaintiffs maintain that Tynkkynen told Rettig that the European market suffered from excess capacity and the UPM would lead the publication paper price increases and

SEO should match the increases.  Allegedly, Rettig agreed and two formulated a plan to work

out the details.  *Id.*  Subsequently, plaintiffs contend, representatives from UPM and SENA met

at the CEPIPRINT conference (an industry conference) and worked to fix European publication

paper prices and address the need for capacity changes in North America.  Tynkkynen testified

that UPM was a market leader in Europe and tried to stabilize prices.  Doc. # 526, ex. 4 at 96.

He also stated in his deposition that he discussed pricing, supply and demand with his European

competitors.  Doc. # 527, ex. 17 at 61:3-14.  The details of the plan were to be ironed out by

Cappelen and Herold at the CEPIPRINT meeting in November 2002.  *Id.*  During CEPIPRINT

Cappelen complained to Herold about UPM's North American prices.  *Id.* at 30:17-31:19.  The

complaint was communicated to Tynkkynen.  *Id.*

Tynkkynen informed his staff on November 1, 2002 that he believed a price increase

would be announced in January 2003.  Korhonen and Tynkkynen met again five days later on

November 6, 2002.  Tynkkynen requested the meeting which took place in Chicago, Illinois at

The Hilton Hotel at Chicago's O'Hare Airport.  Only Korhonen and Tynkkynen attended the

meeting.  Defendants contend that both men were travelling through Chicago on that date and

met during their respective layovers.  It is undisputed that the men discussed union issues, timber

swaps and railroad fees during the meeting.  Tynkkynen also asked Korhonen's views of the

United States publication paper market.  Korhonen characterized the market as very soft and

competitive.  At the end of the meeting Tynkkynen testified that he independently concluded that

SENA would not be initiating any price increases at that time.

Two days later, a SENA internal e-mail involving Peter Mersmann, SENA's Vice

President of Sales and Marketing during the 2002 to 2004 period, and the SENA's sales team

suggested that SENA raise prices on certain paper products.  Doc. # 514, ex. Y.  On November

15, 2002, Mead issued a price increase announcement of $2.00 cwt for grades 1 through 4 effective January 2003. UPM learned of the Mead increase from its customers and on November 16, 2002 decided to follow the increase. Sappi followed two days later. On November 19, 2002, an internal e-mail from Malinen instructed UPM's sales department to inform customers of the increase. Doc. # 514, ex. S. Tynkkynen called Korhonen on November 19, 2002 and left a voicemail stating "Mead is out, we are following." Korhonen did not call Tynkkynen back nor did he tell anyone at SENA or SEO about the message. SENA and IP both announced a price increase on November 20, 2002. *Id.* at ¶ 190. UPM publicly announced its increase on November 22, 2002.

On January 8, 2003, UPM announced that it would be closing two machines in its Blandin Mill. The closures would eliminate approximately 170,000 tons of capacity or 17 % of UPM's publication paper production in the United States.

The facts and communications concerning the February 2003 price increase announcement are summarized here but discussed in detail in section III. A, *infra*. On February 10, 2003, IP announced a $3.00 per cwt increase for coated grade 5 paper, effective April 1, 2003. The same day, UPM executives, including Tynkkynen, met and decided to match any increase announced by IP. The UPM increase was announced to customers on February 11, 2003 by a late afternoon letter. On February 11, 2003, Tynkkynen and Korhonen spoke on the phone for four minutes. The two discussed the agreement that UPM had negotiated with its union at the Blandin Mill and Korhonen told Tynkkynen that "IP is out, SENA will follow" to which Tynkkynen stated that UPM had already notified its customers. *Id.* at 229. The February 2003 increase in the price of grade 5 paper was not well received by clients. Specifically, Jim Radtke of Playboy pushed back and threatened to halt purchases from UPM. UPM was

unbending.  On February 18, 2003 another customer, Bauer, also expressed its unhappiness with the price increases to a SENA employee, who replied "there is no way we can undercut the price increase at this time."  During a February 19, 2003 SENA management team meeting, Mersmann also noted the push back concerning the grade 5 increases.  *Id.* at ¶480.  On February 25, 2003, UPM's Malinen asked Tynkkynen for wiggle room to lower the grade 5 increases – the request was denied.  UPM and SENA's firm stance on the price increase, plaintiffs maintain, is further evidence of the conspiracy to "seriously implement" the February 2003 increase.

Neither Tynkkynen nor Korhonen shared the fact or the substance of their communications with anyone at their respective companies.  In May 2004 the Department of Justice made public that it was investigating the publication paper industry.  Two months later, after Tynkkynen learned that the DOJ sought to interview him concerning anti-trust activity in the publication paper industry, he called Korhonen from a public telephone booth.  Tynkkynen suggested that they have a joint story to tell law enforcement concerning their communications. Subsequently, Tynkkynen met with DOJ officials and UPM entered into a full immunity agreement with the DOJ.  On December 13, 2006 a grand jury in Connecticut issued a one-count indictment charging SENA and other unnamed co-conspirators with price fixing from August 2002 to June 2003.  The case, *United States v. Stora Enso North America Corp.*, 3:06cr323(CFD), proceeded to trial in July 2007.  The jury acquitted SENA.  Similarly, an investigation by the European Commission closed without bringing an action against SENA or SEO.

In November 2004, six months after the DOJ announced its investigation of the publication paper industry, nine actions brought by individual plaintiffs were consolidated for pretrial proceedings in this court as a single multi-district litigation.  Subsequent actions were

filed including those brought on behalf of the indirect purchaser class whose claims are not addressed in this ruling. The initial direct purchaser claims concerned an industry-wide conspiracy involving seventeen defendants and allegations of a price-fixing impacting six grades of paper. At this point, the direct purchaser class plaintiffs have considerably narrowed the scope of the conspiracy which now focuses on the seven contacts between Tynkkynen and Korhonen described above.

## III.    Discussion

The single-count fifth amended complaint alleges that SENA and SEO have violated section one of the Sherman Act, which provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1. Specifically, the plaintiffs have alleged that the defendants engaged in a horizontal price-fixing scheme in which the defendants agreed with non-party UPM to fix, raise, maintain or stabilize prices of publication paper at supra-competitive levels.

Horizontal price-fixing schemes are considered per se violations of the Sherman Act. *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980) (per curiam). In order to prove a horizontal price-fixing scheme, a plaintiff must demonstrate: "(1) the existence of an agreement, combination or conspiracy, (2) among actual competitors, (3) with the purpose or effect of 'raising, depressing, fixing, pegging, or stabilizing the price of a commodity,' (4) in interstate or foreign commerce." *In re Medical X-Ray Film Antitrust Litig.*, 946 F. Supp. 209, 215-16 (E.D.N.Y. 1996) (citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223-24 (1940)). The crucial and only contested issue at summary judgment is the first element: whether the plaintiffs have produced sufficient evidence for a reasonable jury to find that the defendants had

an actual, manifest agreement to participate in a price-fixing conspiracy to affect the U.S. publication paper market, and that SENA and SEO were members of that conspiracy.

Although the Sherman Act's language is arguably broad enough to include a "purely tacit agreement to fix prices," most courts agree "that an express, manifested agreement, and thus an agreement involving actual, verbalized communication, must be proved in order for a price-fixing conspiracy to be actionable under the Sherman Act." *In re High Fructose Corn Syrup Antitrust Litig*., 295 F.3d 651, 654 (7th Cir. 2002), *cert denied*, 537 U.S. 1188 (2003). To prove the existence of an express, manifested agreement, the antitrust plaintiff should present "direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764 (internal quotation omitted); s*ee also Apex Oil Co.,* 822 F.2d at 252 (holding that, "at a minimum," a jury must be able to conclude that "the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement" (quotation omitted)).

Plaintiffs maintain they have properly met the burden of demonstrating with both direct and circumstantial evidence that a jury could reasonably find that defendants engaged in an anti-trust conspiracy and therefore I should deny the motion for summary judgment. First, plaintiffs contend that Tynkkynen's testimony concerning his communications with Korhonen is direct evidence of an agreement and that Korhonen's testimony similarly supports the formation an agreement to fix the price of publication paper. Plaintiffs also assert that they successfully demonstrated that UPM and SENA engaged in parallel conduct in that the entities agreed, through Tynkkynen and Korhonen jointly to follow three industry price increases and to tinker with capacity at their respective facilities, thereby reducing the available supply in the

marketplace. According to plaintiffs, the existence of compelling "plus factors" in this case supports an inference of a conspiracy. To wit, the plaintiffs assert that the publication paper industry is susceptible to price-fixing, the defendants acted against their own self-interest, and that the record is replete with evidence of a traditional conspiracy. Therefore, in plaintiffs' view, a jury could properly infer from this record that SENA, and to a lesser degree SEO, actively conspired with UPM to fix the price of publication paper. The defendants move for summary judgment on the ground that plaintiffs fail to proffer any evidence, direct or circumstantial, that SENA and UPM, through Korhonen and Tynkkynen respectively, agreed to engage in an illegal price-fixing conspiracy in the United States during the years 2002 and 2003.

### A. Direct Evidence of an Agreement

To prove an agreement, the plaintiffs must come forth with facts that demonstrate the defendants had an "express, manifested agreement" to fix the price of publication paper. *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d at 654-55. Direct evidence in a section one price-fixing case is evidence of such strength that no inference is needed to reach the conclusion that an agreement exists. *See In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999). Plaintiffs' proffer the criminal trial testimony of Tynkkynen and Korhonen as direct evidence of an agreement. During the criminal trial, Tynkkynen testified as follows concerning a February 11, 2003 phone call:

A:    [A]ccording to my best recollection, Mr. Korhonen said IP's out and Stora Enso will match and follow.
Q:    And what did you understand him to mean when he said match and follow?
A:    Putting from their side price increase with the same amount with the same valid date and going to implement it also seriously.
***
Q:    All right. So you did have an agreement, is that correct?
A:    According how one is using agreement here in the U.S. we had an agreement.
Q:    Thank you. And what exactly was the agreement you had with Mr. Korhonen.

14

A:     We both understood that both companies are going out or matching IP price
       increase and trying to implement it serious.

Doc. # 526, ex. 4 at 84-88.  Korhonen testified that:

A:     Well, like said, that we were told Markku [Tynkkynen] that we were to announce
       price increase, so follow.  And Markku told that UPM is following any price
       increase.  Something like that.
Q:     And why did you have this discussion with Mr. Tynkkynen about the 2003 price
       increase?
A:     [I]t gave some comfort that we had been reading the market correctly.
Q:     And why did it give you comfort to know that one of your largest competitors was
       also announcing a price increase?
A:     Well, like said, this was consistent, our understanding at the time was that the
       prices were very, very bad and that everybody is needing for price increases and
       this was consistent and confirming that.

*Id.* at 298-99.

That testimony, plaintiffs maintain, exhibits an "express, manifested agreement" between

Korhonen and Tynkkynen to fix the price of publication paper.  Mindful that English is not the

native language of Tynkkynen and Korhonen, I conclude that the record demonstrates that their

testimony, at most, can be characterized as an exchange of information that each entity had

already independently decided to follow the price increase announced by IP on February 10,

2003.  A jury could not reasonably interpret the cited testimony as proof of an agreement to

raise, fix or stabilize future prices of publication paper.

The communication is best understood in the context of the activity in the publication

paper industry during February 2003.  On February 3, 2003, at approximately 4:03 p.m., IP

circulated an internal notice to its sales staff that it intended to hold an internal conference call on

February 6, 2003.  *See* doc. # 514, ex. Z.  IP anticipated announcing a price increase on certain

paper products during the upcoming conference call but did not disclose the fact to its sales

force.  On February 6, 2010 at 10:51 a.m., Korhonen called Tynkkynen on his cell phone; the

call lasted approximately five minutes.[6]  Doc. # 514, ex. A at ex. 12.  At 3:23 p.m. the same day

IP circulated an internal e-mail rescheduling the conference call for February 10, 2003.  *See* Doc.

# 514, ex. Z.  On February 8, 2003, Tynkkynen learned through Lyden that IP intended to

announce a price increase.  Doc. # 514, ex. F at 181-82.  Tynkkynen testified that Lyden learned

about the increase from a UPM customer on February 8, 2003.  Plaintiffs dispute this assertion.

Nevertheless, the record clearly demonstrates that, as early as February 7, 2003, UPM employees

had heard rumors or loose chatter concerning a pending price increase announcement by IP.

Doc. # 526, ex. 4 at 418-19.  At 9:00 a.m. on February 10, 2003, Tynkkynen and others at UPM

met to discuss a price increase and it was decided that UPM would follow any increase

announced by IP.  Similarly, at 9:09 a.m., SENA had internal discussions concerning whether IP

would announce an increase and whether SENA would follow.  Doc. # 514, ex. FF.  On February

10, 2003, IP announced a price increase in the amount of $3.00 per cwt for grade 5 paper,

effective April 1, 2003.  Doc. # 514, ex. A at ex. 13.  SENA held a second discussion relating to

a price increase at 9:15 a.m. on February 11, 2003.  It is undisputed that members of SENA's

sales staff learned of the possible IP increase from certain SENA customers.  Doc. # 514, ex. FF.

Nor is it disputed that SENA's Executive Director of Sales recommended a 5-7% increase on

certain grades of paper in light of IP's rumored increase.  At 1:31 p.m. on February 11, 2003,

UPM drafted a letter to its customers and compiled a spreadsheet of customers to receive the

price increase letter.  Doc. # 514, ex. CC.  UPM intended the letters to be sent that afternoon.  *Id.*

SENA publicly announced an increase to its customers on February 11, 2003 at 3:46 p.m.

Shortly before SENA's public announcement but after UPM decided to increase prices, drafted

---

[6] Neither Tynkkynen nor Korhonen recall the topic of discussion.  To the extent that plaintiffs claim that
it can be inferred that the men discussed the impending IP increase, evidence necessitating an inference
cannot be characterized as *direct evidence*.  *See In re Baby Food Antitrust Litig.*, 166 F.3d at 118.

its letters and compiled its list of customers to receive the price increase letter, Korhonen called Tynkkynen and stated that "IP is out, SENA will follow."

Nothing in the record concerning the February 2003 price increase suggests that Tynkkynen or Korhonen had an agreement to follow the IP increase. Furthermore, although plaintiffs urge that Tynkkynen learned of the IP increase as early as February 3, 2003 and that a jury could properly infer the February 6, 2003 phone call related to an agreement to follow the IP increase, the record evidence does not support that proposition. *See* doc. # 523 at 29 (arguing that the likelihood that Tynkkynen and Korhonen discussed the IP increase during the February 6, 2003 phone call is high). The bases for the assertions are the Department of Justice's handwritten notes of Tynkkynen's interview and the typewritten transcription of those notes.[7] *See* doc. # 529 at 29; *see also* doc. # 528, ex. 74. Although plaintiffs maintain that the handwritten notation "Feb 03" in the handwritten notes implies that Tynkkynen learned of the IP increase on the third of February 2003, a closer examination of the document indicates that the author delineated each suspect price increase by month/year headings. Accordingly, notes concerning the February 2003 price increase fall under the subheading "Feb 03;" a reasonable jury could not interpret that notation to mean February 3, 2003. Furthermore, the fact that the DOJ later mis-transcribed the notation in its typewritten notes as the date Tynkkynen learned of the increase is not helpful to the plaintiffs. Doc. #561, ex. 3. The DOJ typed notes contain

---

[7] The DOJ notes memorializing its interview with Tynkkynen are the subject of the defendants' motion to strike (doc. # 560). As set forth above at note 2, the motion is denied as moot. I will, however, consider the DOJ notes for the limited purpose of addressing plaintiffs' claims concerning the February 2003 price increase. With respect to plaintiffs' argument that Korhonen's statements to the DOJ are similarly inconsistent and therefore evidence of an agreement between Korhonen and Tynkkynen, the claim is without merit. *See* doc. # 566 at 12 (Korhonen's criminal trial testimony that he did not recall telling DOJ investigators that had Tynkkynen conveyed to Korhonen that UPM was not going to follow IP's price increase, Korhonen would not have permitted SENA to follow). The testimony does not create a genuine issue of material fact concerning the February 2003 price increase. What Korhonen might have done under different circumstances is irrelevant; here, the record demonstrates only that SENA arrived at a decision to follow the IP increase wholly independently of any decision by UPM to do so as well.

several errors, including a statement that Korhonen left Tynkkynen a phone message on February 3, 2003, an allegation that even plaintiffs do not make. *See* doc. # 529 at 13 ("On February 6, 2003 Korhonen called Tynkkynen . . ."); *see also* doc. # 528, ex. 72.

To the extent that plaintiffs claim the DOJ notes are admissible to impeach Tynkkynen's prior testimony that he learned of the IP increase on February 8, 2003, the argument fails. Nowhere in the record, other than the DOJ's typewritten summary, is there evidence that Tynkkynen stated that he learned of the increase on February 3, 2003. For reasons set forth above, the typewritten summary is not inconsistent with the record and is an insufficient basis on which to impeach Tynkkynen.

The undisputed evidence concerning the February 2003 price increase demonstrates that SENA and UPM had each independently decided on a course of action in response to IP's increase and that, at most, Korhonen simply communicated SENA's decision after it had been made. That communication cannot have affected the decision UPM had already made to follow IP. Undoubtedly Tynkkynen and Korhonen understood that they were competitors and that they should not be sharing internal information related to pricing decisions. Although information sharing intended to impact pricing decisions is an activity antitrust laws aim to discourage, information sharing, without more, is not direct evidence of a price-fixing agreement. *See Todd v. Exxon Corp.,* 275 F.3d 191, 199 (2d Cir. 2001); *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1034 (8th Cir.), *cert denied*, 531 U.S. 815 (2000). Such conduct is simply an example of a "facilitating practice that can help support an inference of a price-fixing agreement." *Todd*, 275 F.3d at 198. Although the evidence as a whole arguably could support an inference of illegal collusive behavior, a reasonable jury could not find an anti-trust violation on the basis of Tynkkynen and Korhonen's communications alone.

B.     Circumstantial Evidence

In the absence of direct evidence of a price-fixing agreement, i.e., "an admission by the defendants that they agreed to fix their prices," the plaintiffs may present circumstantial evidence from which the existence of "an explicit, manifested agreement" to fix publication paper prices may be inferred.  *In re High Fructose Corn Syrup Antitrust Litig*., 295 F.3d at 654-55.  Here plaintiffs' theory of liability is one of conscious parallelism.  In an oligopolistic market, as the plaintiffs claim the publication paper market is, conscious parallelism is the process "by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interest and their interdependence with respect to price and output decisions."  *Brooke Group v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 227 (1993).  Although not itself unlawful, when two or more competitors in a given market act individually but in a parallel fashion, "this may provide probative evidence of the existence of an understanding by the competitors to fix prices."  *In re Baby Food Antitrust Litig.*, 166 F.3d at 122 (quoting *Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1456 n.30 (11th Cir. 1991)).  Consciously parallel acts permit an inference of conspiracy between competitors,  *Todorov,* 921 F.2d at 1456 n.30, however, no conspiracy can be inferred from mere parallelism when "defendant[s'] conduct can be explained by individual business reasons."  *In re Baby Food Antitrust Litig.*, 166 F.3d at 122.

Accepting, for purposes of this motion, that the three price increases and the capacity reductions constitute parallel conduct, those acts are insufficient to demonstrate a violation of the antitrust laws.  *See E.I. DuPont de Nemours & Co. v. FRC*, 729 F.2d 128, 139 (2d Cir. 1984).  Plaintiffs must come forth with additional facts that tend to exclude the possibility that SENA and UPM acted independently, in their own self-interest, when engaging in parallel conduct.

*Bell Atlantic v. Twombly*, 550 U.S. 544, 553 (2007); *see also generally Apex Oil Co.*, 822 F.2d at 252-53. Simply put, plaintiffs cannot rely solely on the existence of parallel conduct to prove an agreement between SENA and UPM. *See Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 541 (1954); *see also Paycom Billing Servs. v. MasterCard Int'l., Inc.*, 467 F.3d 283, 292 (2d Cir. 2006). Therefore, in addition to submitting evidence of parallel price increases, the plaintiffs must come forward with evidence of so-called "plus" factors, "which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy." *Apex Oil Co.*, 822 F.2d at 253; *see also Todorov,* 921 F.2d at 1456 n.30. Even evidence of "plus factors" in conjunction with parallel activity will fail to give rise to an inference of a section 1 violation if, taking the evidence as a whole, it does not tend to exclude the possibility of independent action. *Monsanto*, 465 U.S. at 764, 768; *Matsushita*, 475 U.S. at 588. Thus, the issue at summary judgment involves a determination whether the plaintiffs have marshaled sufficient evidence to dispel the inference that the defendants acted permissibly. Put another way, if it is just as reasonable to infer from the evidence that the defendant engaged in permissible, independent business activity as it is to infer that it engaged in a price-fixing conspiracy, then a section 1 claim fails on summary judgment. *Blomkest,* 203 F.3d at 1032.

Plaintiffs contend that, because market conditions did not support the announcement of price increases or the implementation of the February price increase in such an allegedly inflexible manner, no reasonable fact finder could conclude that SENA and UPM raised prices or reduced capacity on the basis of permissible independent business reasons. The market, plaintiffs maintain, was over-supplied and demand was low and therefore any announcement by SENA of a price increase without UPM's promise to follow, or vice versa, would have adversely impacted each entity. Defendants counter that the plaintiffs failed to dispel the inference that the

price increases and capacity reductions undertaken by SENA and UPM were independent business considerations. At best, defendants contend, the evidence proffered by plaintiffs at summary judgment is speculative in nature and insufficient to infer the existence of "an explicit, manifested agreement" nor does the evidence presented tend to exclude the possibility that SENA and UPM acted independently in following a competitor's price increase or reducing capacity. Furthermore, defendants argue, the evidence fails to demonstrate that SEO played any role in SENA's decisions to announce price increases or reduce capacity.

In evaluating plaintiffs' circumstantial evidence -- drawing all inferences in favor of the non-moving party as I must at summary judgment -- I am particularly mindful, as set forth above, "that 'antitrust law limits the range of permissible inferences from ambiguous evidence'" in a horizontal price-fixing case, *Apex Oil*, 822 F.2d at 252 (quoting *Matsushita*, 475 U.S. at 588), and that circumstantial evidence of "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of conspiracy." *Matsushita*, 475 U.S. at 588. Accordingly, to defeat the motion for summary judgment, plaintiffs must come forth with evidence that tends to exclude the possibility that the defendants acted independently. *Id.*

### 1. The "Plus Factors"[8]

Plaintiffs argue there is evidence of the following plus factors that, when considered in conjunction with the parallel conduct, permit a jury to reasonably infer that Tynkkynen and

---

[8] Plaintiffs, it appears, have crafted their response to defendants' motion to fit the analysis in *In re EPDM,* 681 F. Supp. 2d 141 (D. Conn. 2009). The comparison fails. At summary judgment the EPDM plaintiffs had evidence of hundreds of inter-firm communications that supported the existence of an agreement between the defendants to take turns leading price increases. Furthermore, the EPDM defendants undertook efforts to conceal the nature of their relationship by using false names and destroying e-mails. They also sold product to competitors at below market prices rather than seeking to co-opt customers when competitors experienced supply problems. The facts of the instant case are easily distinguishable.

Korhonen agreed to fix the price of publication paper: (1) the industry is susceptible to price-fixing; (2) noncompetitive behavior, i.e., the defendants acted contrary to their economic self-interest; and (3) evidence of a traditional conspiracy.  *See In re Flat Glass Antitrust Litig*., 385 F.3d 350, 360 (3d Cir. 2004), *cert. denied*, 544 U.S. 948 (2005).

### a.  Susceptibility

A market is more susceptible to illegal collusion where the market: (1) involves a commodity-like product; (2) for which there are few economic substitutes; (3) has a limited number of sellers; (4) has barriers to market entry; (5) reflects a lack of concentration on the buying side; (6) has sellers that set a "national price"; and (7) exhibits excess capacity.  *In re High Fructose Corn Syrup Antitrust Litig*., 295 F.3d at 656-58.  Plaintiffs have come forth with evidence that publication paper is a commodity product with limited substitutes, the sellers announce national prices, and the market is controlled by a few key sellers (IP, SENA, and UPM).  Furthermore, high capital investment costs limit the entry of new market players, and in 2002 – 2003 the market was already suffering from excess capacity.

The defendants are correct to note the "susceptibility" plus factor is less probative of antitrust conspiracy than other factors.  *See In re Flat Glass Antitrust Litig*., 385 F.3d at 361 (stating that "[t]he most important evidence" will not be the defendants' motive to conspire but "non-economic evidence that there was an actual, manifest agreement not to compete" (internal quotation omitted)).  Here, the structure of the publication paper market is not, by itself, sufficient to defeat the motion for summary judgment, especially when considered in conjunction with the evidence as a whole.

### b. Self-Interest

Evidence that defendants have acted against their self-interest can constitute a plus factor. Where, however, there is an independent business justification for the defendants' behavior, no inference of a conspiracy can be drawn from acts seemingly against self-interest. *Blomkest,* 203 F.3d at 1037. Here the claim is that SENA acted against its own self-interest in two principal ways: (1) announcing price increases when there was insufficient market demand to support the increases, and (2) "implementing price increases in an inflexible manner that, without coordinated conduct would have substantially reduced market share." Doc. # 529 at 24. Neither act is against self-interest. SENA's motivation in following the price increases lead by rival's IP and Mead demonstrates only interdependence, and quite simply, mere interdependence is not sufficient to constitute evidence of an act against self-interest. *In re Baby Food Antitrust Litig.*, 166 F.3d at 135; *see also In re Flat Glass Antitrust Litig.*, 385 F.3d at 359. The theory of interdependence essentially posits that, in an oligopolistic market any one firm's decision to change output or price will be noticeable to the other firms in the market. Therefore, before making such a decision, firms in those markets will naturally take into account the anticipated reaction of their rival firms and it is not unusual to engage in permissible conduct that resembles illegal collusion. *In re Flat Glass Antitrust Litig.,* 385 F.2d at 359 (citing Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1429, at 207 (2d ed. 2000)). "[F]irms in a concentrated market may maintain their prices at supracompetitive levels, or even raise them to those levels, without engaging in any overt concerted action." *Id.*

The desire to increase prices and raise profits is not an act against self-interest and "[i]n a free capitalistic society, all entrepreneurs have a legitimate understandable motive to increase profits." *See In re Baby Food Antitrust Litig.*, 166 F.3d at 137. It is not unusual or improbable

that, absent advanced agreement, SENA would "seriously" implement a price increase in that it would have pressured customers to acquiesce to a price increase.  *Id.* at 135.  Plaintiffs' suggestion that the conduct was against defendants' self-interest because SENA risked losing clients due to a price increase is unpersuasive.  No adverse inference can be drawn from the decision to follow the market leaders in raising prices and thereby increasing profits – conduct that is clearly in defendants' self-interest.  *See generally Blomkest,* 203 F.3d at 1037.

### c.       Traditional Conspiracy

Evidence of a traditional conspiracy can include "proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown."  *In re Flat Glass Antitrust Litig*., 385 F.3d at 361 (quoting Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 1434b, at 243).  During the class period it is undisputed that Tynkkynen and Korhonen met or spoke with each other on at least seven separate occasions, they did not share the fact of their communications with others at their firms, they had a personal relationship other than that of competitors, and they shared sensitive information about their respective firms.   Furthermore, the actions taken by Tynkkynen upon learning of the DOJ investigation, namely reaching out to Korhonen to formulate a "cover-up" story, are consistent with the existence of a traditional conspiracy.  Accordingly, the factual record here supports an inference of a traditional conspiracy.

### 2.       *"Tends to Exclude"*

Even though plaintiffs have identified parallel conduct and certain plus factors, they have failed to offer sufficient evidence to dispel the possibility that SENA and UPM acted independently.  *Blomkest,* 203 F.3d at 1032 ("However, even if [plaintiffs carry their] initial

burden, a court must still find, based upon all the evidence before it, that the plaintiff[s']

evidence tends to exclude the possibility of independent action.") (citing *Monsanto*, 465 U.S. at

764 & 768).  The plus factors identified here, namely the susceptibility of the market and the

suspect communications between Tynkkynen and Korhonen, do not, without more, exclude the

possibility that SENA acted independently in raising the prices charged for publication paper.

Indeed, the evidence proffered in support of the factors identified in this case could support an

equally plausible inference of mere interdependent behavior.  *See Apex Oil Co.*, 822 F.2d at 253-

54.

### a. SENA and UPM follow announced price increases.

The record evidence, as set forth above, is entirely consistent with SENA and UPM

acting independently and in their own self-interests in following the price increases announced

by competitors.  Although SENA had a process for implementing its own price increase, its

pricing philosophy at the time of the alleged conspiracy was to follow the prices announced by a

competitor.  When a competitor announced a price increase, SENA's sales force would work

with Mersmann and determine whether to follow.  Pricing decisions were initiated by SENA's

sales and marketing department and finalized by the senior management team.  The record shows

that Mersmann was responsible for setting prices during the tenure of Korhonen's presidency.

Mersmann and his management team developed SENA's pricing strategy.  Mersmann and his

team would agree on a recommended price increase; Mersmann would present the increase to the

SENA management team at a monthly meeting; and the price increase would be implemented if

agreed on by the team.  Mersmann and his team were also charged with implementing the

increase.  In addition, Mersmann handled implementation of a price increase in response to a

competitor's increase.  Once the team decided on a price increase, Mersmann would then notify

Korhonen of the increase. Although plaintiffs dispute defendants' account of price setting at SENA, there is nothing in the record before me to suggest that Korhonen did more than decide whether to approve or reject a recommended price increase. *See* doc. # 579 at 87-94 (Transcript of Motion Hearing held on September 29, 2010). Accordingly, no reasonable jury could find that SENA's pricing philosophy was established or any pricing decision was made, modified or implemented because of any agreement that Tynkkynen and Korhonen may have reached.

Similarly, UPM's pricing policy in the United States was to follow the price increases announced by competitors. As previously noted, Malinen, as part of the GMS, recommended that UPM implement a pricing strategy that followed the moves of its competitors. UPM's strategy was to follow the prices up or down based on the premise that, in the publication paper industry, price rather than volume controls profitability. Tynkkynen had the final authority of setting publication paper prices charged in the United States by UPM. Malinen's role in price setting was twofold: first, if a major competitor announced a price increase, he would recommend a response to Tynkkynen and other members of the magazine paper division; second he would implement the pricing strategy after the decision was made. Once a price change was decided upon, Malinen and Lyden would negotiate the increase with customers; Tynkkynen was not involved in implementing price increases. Accordingly, as set forth below, plaintiffs have failed to identify any evidence -- and I find none in the record -- that shows that any challenged price increase by SENA was anything other than a legitimate business decision made irrespective of any alleged agreement between Tynkkynen and Korhonen.

i.    August 2002 Price Increase

With respect to the August 2002 IP price increase, plaintiffs argue only that the presence of a pricing strategy consistent with the decision to increase prices does not dispel the inference

of an agreement between Tynkkynen and Korhonen to fix the price of publication paper. Plaintiffs confuse their burden at summary judgment. Faced with an apparently legitimate business decision to increase prices, it is the plaintiffs who must come forth with evidence refuting the claim that would permit a jury to reasonably infer the price increase was not a reasonable business decision and was in fact unlawful. The fact that it is <u>possible</u> that the August 2002 price increase was an outgrowth of an earlier agreement between Korhonen and Tynkkynen is simply not enough where the conduct is just as likely the result of a legitimate pre-established pricing strategy. There is no evidence to support the suggestion that SENA was aware at the time of Tynkkynen and Korhonen's August 8, 2002 meeting that IP was going to announce a price increase. Nor have the plaintiffs come forth with evidence that either Korhonen or, more importantly, SENA altered behavior in approving or disapproving price increases after that meeting; the evidence shows only that SENA acted in accordance with its prior pricing strategy.

Furthermore, there is no evidence that Korhonen told Tynkkynen how SENA would respond to a competitor's price increase, nor did the pair discuss how each other's company would implement any future price increase. In fact, there is no evidence Korhonen and Tynkkynen discussed price increases at the August 8, 2002 meeting, let alone agreed how to implement price increases at the August meeting. Plaintiffs rely heavily on Tynkkynen's testimony that one of his objectives at the meeting was to convince Korhonen and SENA to use the "European way to try and stabilize the market supply and . . . to increase the prices" of publication paper. Doc. # 530 at ¶122. Tynkkynen may well have used his meeting with Korhonen to try to learn about the competitor's supply and explore how restructuring in the United States might resolve issues of overcapacity in the market. Non-party Tynkkynen's independent motive and intention, though possibly binding on non-party UPM, is an insufficient

basis to hold SENA liable for an antitrust violation.  Furthermore, to the extent that Tynkkynen

and Korhonen shared sensitive information at that the meeting, plaintiffs must still show that the

information exchange had some effect on future price increases announced by SENA.  *See*

*generally United States v. United States Gypsum Co.*, 438 U.S. 422, 443 n.16 (1978); *see also*

*Todd*, 275 F.3d at 199.  There is simply no evidence that SENA altered its conduct because of

the meeting between Tynkkynen and Korhonen.  Put another way, even if Tynkkynen and

Korhonen agreed that UPM and SENA would follow rivals' future price increases, the evidence

does not bear out that SENA and UPM altered their conduct to conform with such an agreement.

The price announcements themselves also fail to give rise to an inference of collusive conduct.

Indeed, SENA announced its price increase days before UPM and UPM did not follow SENA's

lead on all products.  Nor could a jury infer from the mere fact that both UPM and SENA

followed IP that they were doing so only because of an agreement between Korhonen and

Tynkkynen.  *See Theatre Enterprises, Inc.,* 346 U.S. at 541; *see also Paycom Billing Servs.*, 467

F.3d at 292.

      Lastly, even if, as plaintiffs contend, Tynkkynen walked away from the August 8 meeting

believing that SENA would follow a competitor's price increase, there is no evidence that

Tynkkynen's independent belief somehow altered UPM or SENA's pricing strategy and a jury

could not infer a conspiracy from Tynkkynen's belief.  *See Capital Imaging Assoc., P.C. v.*

*Mohawk Valley Medical Assoc., Inc.,* 966 F.2d 537, 543 (2d Cir.), *cert. denied*, 510 U.S. 947

(1993) (holding that unilateral conduct on the part of a single entity does not violate the Sherman

Act); *see also generally Apex Oil Co*., 822 F.2d at 256.  Without evidence that tends to exclude

the possibility that SENA and UPM acted independently and consistently with their pricing

strategy, a jury could not infer the existence of an agreement between SENA and UPM from

either Tynkkynen and Korhonen's August meeting or the companies' decisions to follow IP's

August 2002 price increase.

Plaintiffs maintain that -- even though neither testified to this effect -- a jury could

reasonably infer that Tynkkynen and Korhonen used the November 6, 2002 meeting to reaffirm

their agreement to match price increases of competitors and that efforts should be undertaken to

reduce supply and drive up prices.  Doc. # 530 at ¶162.  Plaintiffs claim this assertion is

supported by the November 2002 price increase.  The evidence demonstrates only that UPM and

SENA independently arrived at the determination that each would follow Mead's November 15,

2002 price increase announcement.  Tynkkynen informed his staff on November 1, 2002 that he

believed a price increase would be announced in January 2003.  On November 8, 2002 a SENA

internal email circulated among Mersmann and his team suggesting that SENA raise the price on

certain paper products.  Doc. # 514, ex. Y.  On November 15, 2002, Mead issued a price increase

announcement of $2.00 cwt for grades 1 through 4 effective January 2003.  UPM learned of the

Mead increase from its customers and on November 16, 2002 decided to follow the increase.

Sappi followed two days later.  On November 19, 2002 an internal e-mail from Malinen

instructed UPM's sales department to inform customers of the increase.  Doc. # 514, ex. S.

Tynkkynen called Korhonen on November 19, 2002 and left a voicemail stating "Mead is out,

we are following."  Korhonen did not call Tynkkynen back nor did he tell anyone at SENA or

SEO about the message.  SENA and IP both announced a price increase on November 20, 2002.

*Id.* at ¶ 190.  UPM then publicly announced its increase on November 22, 2002.  UPM further

decided to offer price protection to its own customers on grade 5 paper, a move not adopted by

its rivals.

Accordingly, although Tynkkynen did call Korhonen on November 19, 2002 and tell him that SENA was following Mead, the information had no impact because UPM had already decided to follow Mead on November 16, 2002. Nor did the fact of the call change Korhonen's conduct. Korhonen did not share the fact of Tynkkynen's phone call with anyone at SENA and the record shows that SENA had already been analyzing whether to announce a price increase itself on December 1, 2002. SENA and UPM's decision to follow Mead's price increase in November 2002 does not support an inference that Tynkkynen and Korhonen conspired to fix the price of publication paper.

### iii.　February 2003

As discussed above, the facts concerning the February 2003 increase show that both SENA and UPM independently came to learn about the IP price increase and that the decision to follow was a bottom-up decision at both companies. Only after SENA and UPM had unilaterally decided to follow IP, and UPM had already notified its customers of a price increase, did Korhonen tell Tynkkynen that "IP is out, SENA will follow." Plaintiffs contend that the pair agreed to "seriously implement" the February 2003 price increase; even if that were true, there is no evidence that Korhonen instructed anyone at SENA to handle the price increase differently from previous price increases. Similarly, there is no evidence that those at UPM handled the February 2003 price increase differently as a result of any understanding between Tynkkynen and Korhonen.

Plaintiffs' evidence concerning the three parallel price increases does not tend to exclude the possibility that SENA and UPM were acting consistently with their own permissible independent interests. At best, the communications between Tynkkynen and Korhonen that are temporally close to the price increases are mere exchanges of information and not explicit

agreements.  Because the information exchanges between Korhonen and Tynkkynen occurred after UPM and SENA had independently decided to follow a competitor's publicly announced increase, the conduct fails to give rise to a violation of section 1 of the Sherman Act.  *See generally Gypsum*, 438 U.S. at 443 n.16; *see also Battipaglia v. New York State Liquor Auth.*, 745 F.2d 166, 174 (2d Cir. 1984) ("[A] program to exchange price information was illegal only if, in addition to the agreement to exchange information, the defendants agreed to fix prices." (internal citation omitted)).

### b.    SENA and UPM Reduce Capacity

Plaintiffs contend that SENA's PEP, although internally announced in January 2002, was significantly modified after the August 8, 2002 meeting between Korhonen and Tynkkynen.  It is plaintiffs' position that an internal SENA report concerning the PEP indicated that 80,000 tons of coated mechanical capacity would be removed from the market place.  See doc. # 527, ex. 38 at SEN0151087.  In plaintiffs' view of the case, the increase is conclusively attributable to the August 8, 2002 meeting between Tynkkynen and Korhonen.  That view is not supported by the record.  As defendants aptly note, the July 24, 2002 report regarding the PEP stated that the current capacity of coated mechanical papers was 965,000 tons per year, and the proposed restructuring would have resulted in a reduction in capacity of 145,000 tons.  Doc. # 527, ex. 38 at SEN0151064-5, 9.  The report also observed that, with the implementation of the PEP, SENA's overall market share for coated mechanical papers would drop from 19% to 15%.  *Id.* at SEN0151065.  To the extent that final capacity reduction number changed at all it did so only because the final plan identified the current capacity as 980,000 tons, not 960,000 tons.  *Compare* doc. # 527, ex. 41 at SEN0249511 *with* doc. # 527, ex. 38 at SEN0151064.  The proposed capacity of 820,000 tons remained the same.  *Id.*  Plaintiffs mistakenly argue that it was

only after the August 8, 2002 meeting that SENA decided to take the Biron PM 24 machine off line and thereby increase the capacity reduction. The record demonstrates that the July 24, 2002 report stated that the machine would be on "stand-by" or closed, an expectation also expressed in the initial proposed PEP. Doc. # 514, ex. N at SEN1251771. Furthermore, non-party UPM's subsequent decision to reduce capacity by 17% cannot serve as a basis for defendants' liability even if UPM followed SENA's lead in this respect. *See Capital Imaging Assoc., P.C.,* 966 F.2d at 543; *see also Apex Oil Co.,* 822 F.2d at 254 ("parallel conduct alone will not suffice as evidence of such a conspiracy, even if the defendants knew the other defendant companies were doing likewise."(internal quotation omitted)).

Accepting as true plaintiffs' contention that the publication paper market during the class period was suffering from oversupply and decreased demand, no reasonable jury could conclude that SENA's decision to remove from operation an inefficient, high-cost machine was anything other than an independent business decision. The fact that taking off line certain publication paper production machines might decrease capacity in the marketplace and thereby lead to an increase in the prices charged for publication paper is not, without more, evidence of an agreement to fix, maintain or stabilize the price of publication paper. Indeed the conduct complained of is at least as consistent with independent business activity as it is with a price-fixing conspiracy. *Blomkest*, 203 F.3d at 1032. Accordingly, a reasonable jury could not infer the existence of an agreement between Tynkkynen and Korhonen from the fact that SENA reduced its production of publication paper during the class period.

C.    Plaintiffs' Case Against SEO

Defendants argue that I should not pierce the corporate veil and hold SEO liable for SENA's alleged misconduct. The plaintiffs are not seeking to pierce the corporate veil; they

allege that SEO engaged in the price-fixing conduct as well. Accordingly, plaintiffs bear the same burden for SEO that they do for SENA. The plaintiffs argue that they have shown that SEO worked with UPM with respect to the European market and that SEO's executives may have influenced SENA's corporate leaders through Tynkkynen. Furthermore, plaintiffs allege SENA was under pressure to align its North America strategies with its European strategies. Simply put, plaintiffs have virtually no evidence suggesting SEO played a role in a United States price fixing scheme. No reasonable jury could return a verdict against SEO on this record.

**IV.     Conclusion**

At bottom plaintiffs' case at summary judgment amounts to nothing more than seven instances of information sharing between two executives of competing entities that had no impact on future business activity.   There is no evidence in the record that SENA altered its conduct because of any agreement between Tynkkynen and Korhonen. To the extent that Tynkkynen formed an independent belief concerning SENA's activity and altered UPM's strategy accordingly, the fact cannot support liability against SENA. *See Capital Imaging Assoc., P.C.,* 966 F.2d at 543; *see also Apex Oil Co.,* 822 F.2d at 254, 256. Furthermore, even if Tynkkynen and Korhonen reached a common understanding about the other's approach to pricing, a common understanding does rise to the level of "express, manifested agreement." *In re High Fructose Corn Syrup Antitrust Litig*., 295 F.3d at 654. Lastly, plaintiffs' evidence does not tend to exclude the possibility that defendants acted in accordance with independent, permissible business justification when following a rival's price increase. Accordingly, plaintiffs failed to create a genuine issue of material fact that an agreement between SENA or SEO and UPM affected the prices charged for publication paper in the United States during the class

period.  As a matter of law, plaintiffs' claim fails and defendants' motion for summary judgment is granted in its entirety.

It is so ordered.

The clerk is directed to close the cases brought by the direct purchaser class plaintiffs.

Dated at Bridgeport, Connecticut, this 14th day of December 2010.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge